2014 ND 65

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Todd Michael ZELLER, Defendant and Appellant.**

No. 20130290.

Supreme Court of North Dakota.

April 3, 2014.

Mark R. Boening, Assistant State's Attorney, P.O. Box 2806, Fargo, ND 58108–2806, for plaintiff and appellee.

Jesse N. Lange, P.O. Box 1817, Fargo, ND 58107–1817, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] Todd Zeller appealed from a judgment of conviction after he conditionally pled guilty to possession of methamphetamine with intent to manufacture or deliver and possession of marijuana with intent to manufacture or deliver. We hold the search warrant's provision providing for a nighttime search was not supported by probable cause. We reverse the judg-ment and remand for entry of an order granting Zeller's motion to suppress and to allow Zeller to withdraw his guilty pleas.

I

[¶ 2] In the early morning hours of November 17, 2012, Detective Witte of the Fargo Police Department applied for a search warrant for Zeller's residence at 114 24th Street South in Fargo. Detective Witte presented an affidavit in support of the search warrant alleging Zeller was involved in drug trafficking. The affidavit averred Detective Witte had previously received information in 2010 regarding Zeller distributing methamphetamine in the Fargo area. An investigation was opened, but police were not able to corroborate the information and the investigation was closed. The affidavit further stated that in July 2012, Detective Witte received multiple complaints on the narcotics tip line "from a concerned citizen living in the area of 114 24th Street South." The anonymous tips reported a high volume of short stay, come and go traffic, particularly on the weekend, and that many of the vehicles displayed out-of-state license plates. According to the affidavit, the "concerned citizen" believed the activity was related to narcotics trafficking. At the request of law enforcement, the "concerned citizen" provided police with five license plate numbers. According to the affidavit:

Two of the license plates provided by the concerned citizen came back to [J.G.] and [J.B.]. Your Affiant has previously dealt with these two individuals and is aware they both use methamphetamine. The identity and reliability of the concerned citizen is unknown to your Affiant. Based on this information, your Affiant re-opened an investigation into Todd Zeller, Lisa Foulkes, and 114 24th Street South.

[¶ 3]   The affidavit further stated that on November 16, 2012, several detectives, including Detective Witte, executed a controlled purchase of methamphetamine from John Gust by using a confidential informant.   The controlled buy took place in the vicinity of Zeller's residence.   Police used "recorded funds" to purchase the methamphetamine.   According to the affidavit, "At approximately 10:35 p.m., Gust told the [confidential informant] he was going to meet his 'dealer' to obtain more methamphetamine.   Gust exited the vehicle and walked on foot to an unknown location.   A short time later, Detective Christensen observed Gust in the alley immediately behind 114 24th Street South."   Gust then returned to the confidential informant and dropped him off at a bar.   Officers picked up the confidential informant, a recording device, and conducted a field test on a substance that was later determined to be methamphetamine. From the face of the affidavit, we are left to assume that the substance later determined to be methamphetamine was given to the confidential informant by Gust.

[¶ 4]   The affidavit also stated that officers subsequently conducted a traffic stop on Gust. Gust was placed under arrest for delivery of methamphetamine.   The recorded buy-fund money was not recovered. According to the affidavit "Detective Christensen also searched Gust's phone incident to his arrest and located a recent text message from 'Todd Z' … asking Gust if he was close to the area."   Fargo Police records indicated the number belonged to Todd Zeller of 114 24th Street South, Fargo.

[¶ 5]   Based on this information, the magistrate authorized the search warrant of Zeller's residence at 3:25 a.m. The warrant included a provision permitting law enforcement to conduct the search at night.   Police executed the warrant at ap-proximately 4:00 a.m. During the search, officers discovered narcotics and paraphernalia.   Zeller was arrested and charged with nine felonies.   Zeller filed a motion to suppress, arguing the search warrant was not supported by probable cause, and that alternatively, the nighttime provision in the search warrant was not supported by probable cause.   Following a hearing, the district court denied the motion to suppress.

[¶ 6]   Zeller filed a second motion to suppress, arguing Detective Witte misled the magistrate to obtain the search warrant.   Zeller requested a Franks hearing to determine whether the search warrant was based on false statements made by the detective.   After a hearing, the court denied Zeller's motion.   Zeller entered a conditional guilty plea reserving the right to appellate review of the court's ruling on his motions to suppress.

## II

[¶ 7]   We   affirm   a   district court's order denying a motion to suppress evidence if there is sufficient competent evidence fairly capable of supporting the court's findings, and the decision is not contrary to the manifest weight of the evidence.   *State v. Holly*, 2013 ND 94, ¶ 11, 833 N.W.2d 15.   "Questions of law are fully reviewable on appeal, and whether a finding of fact meets a legal standard is a question of law."   *Id.* Whether there is probable cause to issue a search warrant is a question of law which is fully reviewable on appeal.   *State v. Rangeloff*, 1998 ND 135, ¶ 16, 580 N.W.2d 593.   "We generally defer to a magistrate's determination of probable cause if there was a substantial basis for the conclusion, and doubtful or marginal cases should be resolved in favor of the magistrate's determination."   *Roth v. State*, 2007 ND 112, ¶ 18, 735 N.W.2d 882.

III

[¶ 8] Zeller argues the search warrant was issued without probable cause. Alternatively, Zeller contends that, even if there was probable cause to support the warrant, the nighttime search provision in the warrant did not contain sufficient separate probable cause necessitating the need to execute the warrant at night. For purposes of this opinion, the dispositive issue on appeal is whether there was probable cause for the nighttime search.

[¶ 9] The Fourth Amendment to the United States Constitution and Article I, Section 8 of the North Dakota Constitution protect individuals from unreasonable searches and seizures. *State v. Sommer*, 2011 ND 151, ¶ 9, 800 N.W.2d 853. "If an individual has a reasonable expectation of privacy, the government must acquire a search warrant unless the search fits within a recognized exception to the warrant requirement." *Id.* "Probable cause is required for a search warrant under the Fourth Amendment to the United States Constitution, and Article I, Section 8 of the North Dakota Constitution." *Rangeloff*, 1998 ND 135, ¶ 16, 580 N.W.2d 593. Probable cause to search exists if it is established that certain identifiable objects are probably connected with criminal activity and are probably to be found at the present time at an identifiable place. *State v. Roth*, 2004 ND 23, ¶ 7, 674 N.W.2d 495. This Court employs the totality-of-the-circumstances test to review whether information before the magistrate was sufficient to find probable cause, independent of the trial court's findings. *Rangeloff*, 1998 ND 135, ¶ 16, 580 N.W.2d 593. In applying the totality-of-the-circumstances test, this Court has stated:

Although each piece of information may not alone be sufficient to establish probable cause and some of the information may have an innocent explanation, prob-

able cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observed as trained officers.

*Holly*, 2013 ND 94, ¶ 12, 833 N.W.2d 15.

[¶ 10] Significantly, for this case, where a warrant application seeks authorization for a nighttime search, an additional showing of probable cause is required for the nighttime authorization. *Roth*, 2007 ND 112, ¶ 19, 735 N.W.2d 882. Under N.D.R.Crim.P. 41(c)(1)(E), a search warrant "must be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." Reasonable cause and probable cause are synonymous. *Holly*, 2013 ND 94, ¶ 35, 833 N.W.2d 15. "Daytime" is defined as "the hours from 6:00 a.m. to 10:00 p.m. according to local time." N.D.R.Crim.P. 41(h)(2)(B). "The purpose of Rule 41(c), N.D.R.Crim.P., is to protect citizens from being subjected to the trauma of unwarranted nighttime searches. Courts have long recognized that nighttime searches constitute greater intrusions on privacy than do daytime searches." *State v. Fields*, 2005 ND 15, ¶ 9, 691 N.W.2d 233.

[¶ 11] Probable cause for a nighttime search exists upon a showing that the evidence sought may be quickly and easily disposed of if the warrant is not promptly executed. *Id.* at ¶ 10. "An officer must set forth some facts for believing the evidence will be destroyed other than its mere existence. Mere allegations about the presence of drugs do not lead to the inference that the drugs are easily disposable." *Roth*, 2007 ND 112, ¶ 21, 735 N.W.2d 882 (citations omitted). "Courts have upheld nighttime searches when there was particularized evidence of drug trafficking, sales, or manufacture which oc-

curred late at night or in the early morning hours." *Id.* at ¶ 23. We have also stated, "Necessity for a nighttime search exists where there is a reasonable possibility that the fruits, instrumentalities or evidence of crime sought would not be expected to be at the searched premises during the day or might be removed or dissipated if the search is delayed." *Holly*, 2013 ND 94, ¶ 36, 833 N.W.2d 15. "[T]here must be some basis for believing the evidence will be destroyed without a nighttime search other than the fact the evidence exists." *State v. Torkelsen*, 2008 ND 141, ¶ 32, 752 N.W.2d 640. In *Fields* this Court held, "To the extent our prior decisions approved a per-se rule justifying the issuance of nighttime warrants in drug cases, they are overruled." *Fields*, 2005 ND 15, ¶ 10, 691 N.W.2d 233.

[¶ 12] In the affidavit in support of the search warrant application, Detective Witte included a special request for nighttime service authorization "to allow officers the ability to get closer to the residence before being detected under the cover of darkness." The affidavit stated, "entry of law enforcement in this manner will be safer to those inside as well as the law enforcement officers executing the search warrant." Detective Witte further averred, "this methamphetamine transaction occurred between the hours of 10 p.m. and 11 p.m. and the investigation is ongoing. Your Affiant notes this information was developed in the late hours of November 16th and early morning hours of November 17, 2012."

[¶ 13] At the suppression hearing, Detective Witte testified on cross-examination that a nighttime provision does not provide any more safety than a daytime warrant. The detective also testified part of the reason for the nighttime provision is that the evidence might be lost by the morning, and that depending on the circumstances, a nighttime search can be more dangerous. The detective also testified:

I had no information related to Mr. Zeller being armed, being dangerous, or specifically that showed exigent circumstances where he would destroy evidence. However, I do have an indication that Mr. Zeller is continuing his criminal activities at night, which leads me to conclude that if he has X-amount of narcotics in his residence for sale, if he continues selling throughout the night, I have no idea what's going to be left when I execute the search warrant.

Detective Witte testified that he started writing the warrant application between midnight and 1:00 a.m., and that "If I'm staying up and I'm writing a search warrant in the middle of the night, the intention is to serve it at that time period.... if I have probable cause I'm not going to not write it and then get up at 8:00 o'clock and write it."

[¶ 14] Applying these facts, we conclude there is nothing in the record, beyond the single incident of the controlled buy, to indicate that without the nighttime search, the evidence would have been destroyed or removed from the premises before a search could be executed in the morning hours. Detective Witte admitted at the suppression hearing, "I had no information related to Mr. Zeller ... specifically that showed exigent circumstances where he would destroy evidence." Specifically, there was no information in the affidavit to suggest Zeller was likely to destroy evidence, or any other exigent circumstances to suggest the controlled buy money and the narcotics would be removed or disposed of before 6:00 a.m. Similarly, the record here does not establish that officer safety necessitated execution of the nighttime search warrant.

[¶ 15] Additionally, the facts do not suggest that the controlled buy conducted

in the vicinity of the Zeller residence was part of an ongoing trafficking operation where drugs were moved, traded, bought, or sold during the nighttime hours. Had there been evidence of previous drug deals taking place during the night, visitors coming and going at all hours, or similar information relaying evidence of trafficking during the nighttime hours, this evidence may have manifested a reasonable possibility that the fruits, instrumentalities or evidence of the alleged crime might have dissipated if the search was delayed. Here, however, officers left Zeller's residence after conducting the controlled buy and did not conduct any surveillance on the Zeller residence from approximately midnight until 4:00 a.m. when the warrant was executed. Without surveillance, there is no indication that the targeted contraband was being bought and sold, or disappearing from the scene. In isolation, the controlled buy alone does not suggest continued trafficking during the night, and the affidavit did not indicate whether police had evidence of ongoing nocturnal drug transactions. Consequently, because there was no evidence of ongoing criminality, there is no basis for believing that the drugs would evanesce before the daylight search hours.

[¶ 16] Our previous decisions also require particularized facts illustrating the need to execute the warrant at night. For instance, in *Roth*, a majority of this Court concluded there was sufficient probable cause to justify a nighttime search where the affidavit indicated the defendant manufactured methamphetamine in his home late at night, surveillance established that there was activity in the basement during the late nighttime hours, and that at least one other person connected with drug activity was in the residence at the time. *Roth*, 2007 ND 112, ¶ 27, 735 N.W.2d 882. We held that in

order for police to apprehend Roth in the process of manufacturing methamphetamine, the search needed to be executed at nighttime rather than during the day. "If law enforcement searched Roth's residence at a time when he was not manufacturing, it was reasonably probable that much of the evidence of the manufacturing process, including the methamphetamine itself, would have been removed from the premises." *Id.*

[¶ 17] Similarly, in *Holly*, a majority of this Court held that evidence in an affidavit sustained a finding of probable cause justifying the nighttime search of the defendant's vehicle. *Holly*, 2013 ND 94, ¶ 42, 833 N.W.2d 15. The affidavit indicated the defendant would be traveling to Whitefish, Montana, to purchase marijuana and prescription drugs. *Id.* It also noted the defendant would be transporting narcotics in his white Ford Ranger, and he would be returning to Minot during the evening hours. *Id.* We concluded, "The inherent mobility of the vehicle provided the nighttime probable cause to infer the illegal drugs would not be expected to be in Holly's vehicle the following day or might be removed if the search was delayed to daytime." *Id.* at ¶ 44. However, we also concluded the facts in the affidavit did not contain sufficient probable cause to justify a nighttime search of the defendant's residence. *Id.* at ¶ 45. We held that, unlike *Roth*, the affidavit did not contain particularized facts indicating the need to search the residence during the commission of the alleged crime, and there was no information that the drugs would be moved from the vehicle into the residence. "The warrant affidavit established only the presence of a 'bong' in the residence and that Holly smoked marijuana in the residence. It lacked any information to establish the evidence would be destroyed or quickly removed from the resi-

dence prior to the execution of a daytime warrant." *Holly,* at ¶ 47.

[¶ 18]   A survey of related cases in other jurisdictions similarly reflects the general principle that there must be some particularized evidence showing that the contraband may be destroyed, sold, or removed during the nighttime search hours. *See, e.g., State v. Martinez,* 306 Ark. 353, 811 S.W.2d 319, 321 (1991) (holding the affidavit was insufficient to support issuance of nighttime search warrant where the affidavit was silent with respect to anything regarding reasonable cause to believe that marijuana would be destroyed or removed before next morning, that the place to be searched was difficult of speedy access, or that warrant could only be safely or successfully executed at nighttime); *Hall v. State,* 302 Ark. 341, 789 S.W.2d 456, 458 (1990) (holding that an affidavit simply reciting that illegal drugs were present at the defendant's residence and that a confidential informant had purchased marijuana at the residence within the last seventy-two hours did not state facts sufficient to support the issuance of a nighttime search warrant); *State v. Jackson,* 742 N.W.2d 163, 172 (Minn.2007) (holding nighttime search of defendant's residence violated her Fourth Amendment rights where police failed to provide facts in an affidavit showing the nighttime search was necessary to prevent the loss, destruction, or removal of the objects of the search); *State v. Fitch,* 255 Neb. 108, 582 N.W.2d 342, 348 (1998) (concluding an affidavit in support of a nighttime search warrant contained no facts that would support an inference that the contraband was being disposed of, removed, or hidden in such a manner that nighttime service was required); *compare State v. Jackson,* 117 Ariz. 120, 571 P.2d 266, 268 (1977) (holding the magistrate did not abuse his discretion in finding sufficient reasonable cause to justify nighttime search where defendants were selling marijuana at all hours of the day and night).

[¶ 19]   The State argues it was reasonable for the issuing magistrate to authorize the nighttime search because time was of the essence.  "The missing Fargo Police Department buy-monies were more likely to be recovered if law enforcement acted immediately.  The need for immediate execution resulted in the request for nighttime authorization."  However, at the suppression hearing, Detective Witte testified there was no specific reason to believe that the money would not be at the residence in the morning.  In addition, the following colloquy between Detective Witte and counsel for Zeller demonstrates that law enforcement did not have specific information that the drugs or buy-money would disappear before morning:

Q.   Now, did you have any reason to believe that Mr. Zeller was more likely to spend money between the hours of 4 and 6 a.m., than he would be to spend money between—I don't know, between 11 and 4 a.m.?

A.   No.

Q.   Did you have any specific intelligence about Mr. Zeller's plans that evening?

A.   No.

Q.   Did you have any evidence that Mr. Zeller was intending to leave his residence?

A.   No.

Q.   Did—again, you did not have anybody surround the home or keep an eye on the home to see if he was going to go and spend his money?

A.   We had officers at the residence periodically checking.  But no.  We didn't have the manpower to set up a perimeter around Mr. Zeller's residence.

Q. Did you—you didn't even have one person staying there continuously, correct?

A. Correct.

Q. Your concern here was that people can just basically generally can spend cash money relatively easily, is that correct?

A. No. It's not just the money, it's also the quantity of drugs that is—I have no idea what quantity of drugs Mr. Zeller has inside the residence until I serve the search warrant.

[¶ 20] We conclude the nighttime search warrant did not establish sufficient probable cause to justify a nighttime search of Zeller's residence. The affidavit in support of the nighttime search warrant contained no information that Zeller was selling narcotics throughout the night, nor did it contain indicia that the evidence sought by law enforcement might quickly and easily be disposed of if the warrant was not executed within the nighttime hours. Additionally, the affidavit did not reflect that the officers faced a threat of physical violence that would justify executing the warrant at nighttime. *Cf. State v. Herrick*, 1997 ND 155, ¶ 17, 567 N.W.2d 336 (stating "In situations where a threat of physical violence or possible destruction of evidence may exist, officers may validly execute a no-knock warrant.").

IV

[¶ 21] We reverse the judgment of conviction and remand with instructions to allow Zeller to withdraw his guilty pleas and to suppress the evidence obtained as a result of the nighttime search.

[¶ 22] WILLIAM A. NEUMANN, S.J., CAROL RONNING KAPSNER, and DANIEL J. CROTHERS, JJ., concur.

[¶ 23] The Honorable WILLIAM A. NEUMANN, S.J., sitting in place of McEVERS, J., disqualified.

SANDSTROM, Justice, dissenting.

[¶ 24] I believe our Court has gotten off track in equating nighttime search warrants with no-knock search warrants in drug cases.

[¶ 25] In *State v. Fields*, 2005 ND 15, ¶ 10, 691 N.W.2d 233, we said, "To the extent our prior decisions approved a per-se rule justifying the issuance of nighttime warrants in drug cases, they are overruled. *See [State v.] Herrick*, 1997 ND 155, ¶ 21, 567 N.W.2d 336 (overruling per-se rule allowing no-knock warrants in drug cases)."

[¶ 26] The United States Supreme Court has set up stringent Fourth Amendment requirements for no-knock search warrants. For "a 'no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997); *see also United States v. Gay*, 240 F.3d 1222 (10th Cir.2001). No blanket exception to the knock-and-announce requirement is permitted even for drug investigations. *Richards*, 520 U.S. at 388, 117 S.Ct. 1416.

[¶ 27] In contrast, the United States Supreme Court has said that magistrate approval of a nighttime search warrant in a drug case "requires no special showing for a night-time search, other than a showing that the contraband is likely to be on the property or person to be searched at that time." *Gooding v. United States*, 416 U.S. 430, 458, 94 S.Ct. 1780, 40 L.Ed.2d 250 (1974). In that case, the Court ad-

dressed a specific federal statute for drug cases and refused to give it a more restrictive requirement of other special circumstances.

[¶ 28] As outlined by the United States Supreme Court decisions, equating nighttime searches with no-knock searches, as we did in *Fields,* is misplaced. What we have done by opinion we can undo by opinion. And I would do so.

[¶ 29] We previously said, " 'The purpose of Rule 41(c), N.D.R.Crim.P., is to protect citizens from being subjected to the trauma of unwarranted nighttime searches. Courts have long recognized that nighttime searches constitute greater intrusions on privacy than do daytime searches.' " *Fields,* 2005 ND 15, ¶ 9, 691 N.W.2d 233 (quoting *State v. Schmeets,* 278 N.W.2d 401, 410 (N.D.1979)). This no longer makes sense, particularly for drug searches. Past stereotypes do not reflect present reality. We are no longer a sleepy village where television goes off the air at 11 or 12, and every business is shut down during the night. Today people work around the clock. The drug culture appears to be particularly alive at night.

[¶ 30] In this case, the subjects were wide awake at nighttime. When the controlled drug buy took place during the nighttime, there was no rational reason that execution of the warrant should have been delayed beyond the nighttime.

[¶ 31] I would affirm.

[¶ 32] DALE V. SANDSTROM